# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT


**07-1386**


**BRIAN COLE**

**VERSUS**

**ACADIA PARISH SHERIFF'S DEPT., ET AL.**


\*\*\*\*\*\*\*\*\*\*


APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 76015
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE


\*\*\*\*\*\*\*\*\*\*


**ULYSSES GENE THIBODEAUX**
**CHIEF JUDGE**


\*\*\*\*\*\*\*\*\*\*


Court composed of Ulysses Gene Thibodeaux, Chief Judge, John D. Saunders, and Marc T. Amy, Judges.


**AFFIRMED.**


Homer Edward Barousse, Jr.
P. O. Box  1305
Crowley, LA 70527-1305
Telephone:  (337) 785-1000
COUNSEL FOR:
    Defendant/Appellee - Acadia Parish Sheriff's Department

Michael W. Robinson
Pucheu, Pucheu & Robinson, L.L.P.
P. O. Box 1109
Eunice, LA 70535
Telephone:  (337) 457-9075
COUNSEL FOR:
    Plaintiff/Appellant - Brian Cole

**John Jerry Glas**
**Kelly E. Theard**
**755 Magazine Street**
**New Orleans, LA 70130**
**Telephone: (504) 581-5141**
**COUNSEL FOR:**
  **Defendant/Appellee - Acadia Parish Sheriff's Department**

**THIBODEAUX, Chief Judge.**

The plaintiff, Brian Cole, brought claims against the Acadia Parish Sheriff and the Sheriff's Department for negligent medical care while Mr. Cole was incarcerated at a parish facility known as the Detention Center. Following a bench trial, the trial court rendered judgment in favor of the Acadia Parish Sheriff, the Sheriff's Department, and Evanston Insurance Company, dismissing Mr. Cole's claims against them. Mr. Cole's motion for a new trial was denied. Mr. Cole filed this appeal. We affirm the judgment and denial of a new trial but for reasons other than those expressed by the trial court.

I.

**ISSUES**

We must decide:

(1)    whether the trial court manifestly erred in granting judgment in favor of the defendants; and,

(2)    whether the trial court erred in denying a new trial to the plaintiff.

II.

**FACTS AND PROCEDURAL HISTORY**

Brian Cole was incarcerated in 1998 at the Acadia Parish Detention Center, one of three facilities operated by the Acadia Parish Sheriff's Department.

On June 16, 1999, Mr. Cole was seen by one of the two medics at the Detention Center, Mamie Trahan, after having complained in writing of a toothache on June 15th. Ms. Trahan, a certified paramedic, examined Mr. Cole's mouth and gums, noted the top back tooth that he suggested pulling, and noted no swelling to the gum area at this time. She put him down for a dental appointment. The dental appointment was scheduled for July 2, 1999. There was testimony that Mr. Cole

began taking Ibuprofen on June 19th, presumably in response to a verbal request that was passed along to a medic, but he did not sign the medication log until 8:00 p.m. on June 20th. He continued taking Ibuprofen and testified that the toothache "kind of went away."

On June 26th, Mr. Cole complained verbally of "toothache and pain." Within a few minutes of this complaint, medic Vince Cole arrived, and Mr. Cole began receiving hydrocodone, a pain killer.

Mr. Cole filled out two other Request for Medical Attention forms on June 27 and 28, 1999, complaining of "a bad cold or the flu." Within two days, he was given cold medication by a medic. He was again seen by a medic on June 28th following his verbal emergency request and was given soup, juices, nasal spray, cough drops, and Alka Seltzer for his complaints of fever, sore throat, sinus congestion, and inability to eat. At that time, medic Trahan also telephoned Dr. Holden for an antibiotics prescription.

At 2:45 a.m. on June 29th, Mr Cole's left eye was swollen shut, and he complained verbally of constant headaches and body pains, and said that no medicine was working. Medic Trahan was called and was on her way. At 2:50 a.m., Mr. Cole was given a Coke with ice to settle his stomach. Shortly after 3:00, medic Trahan and Sgt. Jagneaux came and collected Mr. Cole and transported him to the American Legion Hospital in Crowley. Medic Trahan's Medical Incident Report stated that she was called at 3:15 a.m. and found Mr. Cole in worse condition, unsteady, and complaining of chest pain and difficulty breathing. At the hospital's emergency room, Mr. Cole's temperature was 97.8°. Dr. Wong diagnosed him with a toothache, treated him for upper left molar infection, treated him with bicillin, gave him toradol

for pain, and sent him back to the Detention Center. At 4:10 a.m., Ms. Trahan returned to the facility with Mr. Cole.

Later on the 29th, Mr. Cole was again transported to the American Legion Hospital and later during the day was transferred to Charity Hospital in New Orleans after being diagnosed with sinusitis and cellulitis.

Mr. Cole was admitted to Charity Hospital on June 30, 1999, and was seen by an opthamologist who confirmed the diagnosis. During his treatment there, he was x-rayed by a dentist who determined that the problem was not Mr. Cole's teeth. The doctors at Charity administered aggressive treatment consisting of intense intravenous antibiotics, and Mr. Cole responded well for approximately a week before suddenly taking a turn for the worse. He began having difficulty swallowing and experienced respiratory distress. The antibiotics had not succeeded against the abscesses that had formed, and bacteria had spread into his neck and chest. It was ultimately determined that Mr. Cole's illness was the result of the colonization of a bacteria identified as beta hemolytic streptococcus group F, a rare and virulent organism, along with a mixture of other organisms. As testified to by the experts, antibiotics alone will not eliminate an abscess. Once the abscess is formed, it has to be drained.

Mr. Cole underwent surgery to remove the abscess in his neck and to remove several liters of infectious processes and purulence or pus from his chest. Due to the anticipated pain, coma was induced for several weeks, and Mr. Cole was not released from the hospital until October 1999. During the process, Mr. Cole suffered the loss of three toes and had extensive surgical scarring. However, Mr. Cole is reported to have undergone a remarkable medical recovery and was working at the time of the trial of this matter in July 2006.

3

Mr. Cole contended at trial that the spread of the Group F could have been prevented and that the Detention Center staff was negligent in not administering antibiotics initially in response to Mr. Cole's complaint of a toothache and, at later points, when he received pain medication. He further contended that the staff was negligent in not obtaining a dentist appointment earlier than the July 2, 1999 date because, even though Mr. Cole did not have a dental problem, the dentist would have recognized that sometimes a maxillary sinus infection will mask as a toothache, and the dentist would have sent Mr. Cole on to a physician.

The trial court provided an analysis of the time line of Mr. Cole's treatment and medication administered by the Sheriff's Department. The trial court ultimately determined that the scheduling of the dentist appointment, for seventeen days after the initial exam by the medic, was reasonable given that Mr. Cole initially complained of a non-emergency toothache, with no outward signs of infection or a broken tooth. It further found that, while reasonable care would require further documented examinations of Mr. Cole's mouth by the medics when Mr. Cole was approved for pain medication, the medics would not have found signs of infection leading to a prescription for antibiotics because Mr. Cole's problem was not his teeth.

Therefore, the trial court concluded, the failure to provide evidence of further examinations was not the cause-in-fact or the legal cause of Mr. Cole's complications under a duty-risk analysis. The trial court reasoned that, based upon the expert testimony and the evidence, by the time that Mr. Cole complained verbally to the sergeant of a cold on June 26th, the infection had spread, and Mr. Cole's complications could not have been prevented.

4

III.

## LAW AND DISCUSSION

### Standard of Review

Great weight is to be given the trier of fact's findings and will be overturned only if manifestly erroneous. *Taylor v. Treen*, 446 So.2d 906 (La.App. 1 Cir. 1984), citing *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). The trial judge's findings of fact and credibility determinations shall not be reversed unless they are manifestly erroneous. *Canter v. Koehring Company*, 283 So.2d 716 (La.1973).

### Standard of Care

With regard to jails and prisons, the Department of Corrections oversees a facility's compliance with established health standards, pursuant to La.R.S. 15:751, which states as follows:

> All jails, prisons, lockups and camps and all facilities, units and rooms of such jails, prisons, lockups and camps where prisoners are detained or confined must meet standards of health and decency which shall be established by the state division of health. The director of the Department of Corrections shall confer with the state health officer or his duly authorized representative concerning the establishment of such standards for all correctional institutions. The state health officer or his duly authorized representative shall periodically inspect all correctional institutions to determine if such institutions are in compliance with the established standards and he shall prepare and issue a report on his findings to the governor, the state hospital director and the administrators of the various institutions.

The standard of care imposed upon the Department of Corrections in providing for the medical needs of inmates is that services be reasonable. *Elsey v. Sheriff of Parish of East Baton Rouge*, 435 So.2d 1104 (La.App. 1 Cir.), *writ denied,* 440 So.2d 762 (La.1983); *Robinson v. Stalder*, 98-558 (La.App. 1 Cir. 4/1/99), 734

So.2d 810; *Brown v. State*, 392 So.2d 113 (La.App. 1 Cir. 1980). The reasonable standard of care is not in dispute in this case. Pursuant to *Robinson*, the duty of reasonable care derives partly from La.R.S. 15:831(A), which provides as follows: "The secretary of public safety and corrections shall establish and shall prescribe standards for health, medical, and dental services for each institution, including preventive, diagnostic, and therapeutic measures on both an outpatient and a hospital basis, for all types of patients." It further provides that an inmate should be taken to a medical facility outside of the institution when deemed necessary.

In *Elsey*, *Robinson*, and *Brown*, the courts cited the statutory authority for imposing the duty as La.R.S. 15:760, which provides: "[w]here large numbers of prisoners are confined, the proper authorities in charge shall provide hospital quarters with necessary arrangement, conveniences, and attendance, etc." The court in *Elsey* further explained that the general statutory scheme of La.R.S. 15:761 (repealed; now see R.S. 15:751 above) is that the duty imposed under R.S. 15:760 shall apply to all jails, prisons, and lockups located in Louisiana. However, *Elsey* made it clear that the duty to provide reasonable medical care does not require the placement of a full hospital on every prison site in order to protect an inmate against every medical risk.

Mr. Cole cited several cases including *Elsey* and *Robinson*. He also cited *Dancer v. Department of Corrections*, 282 So.2d 730 (La.App. 1 Cir. 1973) and *Moreau v. State, Dep't of Corr.*, 333 So.2d 281 (La.App. 1 Cir. 1976), for the proposition that the standard of reasonable care is derived from La.R.S. 15:760, R.S.15:831, *and* La.R.S.15:859. At the time of those cases, Section 859 provided that the "superintendent shall appoint physicians who shall visit the convicts at least three times a week." However, that is no longer the law, as La.R.S. 15:859 now provides for inmate spiritual and guidance services. Moreover, *Dancer* and *Moreau* are clearly

distinguishable. Contrary to Mr. Cole's assertions, *Moreau*, a wrongful death case where inadequate medical care was alleged following a prison stabbing, did not address a lack of written standards. Moreover, the analogy that counsel for Mr. Cole attempts to draw between medical personnel who failed to recognize an emergency with multiple bleeding stab wounds, and medical personnel who saw no emergency in a toothache with no signs whatsoever of tooth injury or infection, is untenable.

Likewise, in *Dancer,* the prison inmate, who sustained injury to his right leg and ankle while playing in a game of football organized by prison authorities, recovered with reasonable medical services for the treatment of a fracture that caused the inmate's residual disability. Mr. Cole emphasized this case for the proposition that inmates should be diagnosed and treated by *qualified physicians and surgeons.* However, again, this case is clearly distinguishable, given that the plaintiff in *Dancer* was largely treated by *inmates* working in the prison hospital for *broken bones*, contrary to the present case where a toothache was treated by a certified EMT-paramedic and an EMT medic.

Mr. Cole also cites *Calloway v. City of New Orleans*, 524 So.2d 182, (La.App. 4 Cir.), *writ denied,* 530 So.2d 84 (La. 1988), a wrongful death action by a pregnant mother for the death of her prematurely born daughter against the sheriff of the jail in which the mother had been incarcerated prior to birth and the hospital where the baby was born. In that case, an award of damages was affirmed but reduced, where prison medical personnel were aware of the prisoner's pregnancy and abdominal pains, but gave her a very minimal examination, and did not allow her to see a nurse until twelve hours after her incarceration. Again, it is untenable to suggest that a toothache with no signs of infection or severe pain is analogous to a pregnant woman in obvious labor.

7

## Timing of Antibiotics

Dr. Joe Ben Holden was the facility's contract physician. At trial in 2006, Dr. Holden confirmed repeatedly that he would want to see evidence of infection, such as swelling or broken teeth before putting a patient on antibiotics. He also provided the names of several maladies that can cause facial pain, and stated that they do not all require antibiotics. He further testified that he would expect the medics to call him if there was a complaint of *severe* pain, but that he trusted them to decide when and if to call him.

Paramedic Mamie Trahan and medic Vince Conde testified that they would have called Dr. Holden for antibiotics early on if there had been signs of infection, such as swelling or redness, or complaints of severe pain. Dr. Holden, admitted into court as an expert in internal medicine, was under contract with the Sheriff's Department for fourteen or fifteen years. He further pointed out that antibiotics do not always hit the specific germ involved. He testified that he was not certain that putting Mr. Cole on antibiotics a week or two earlier would have made that much difference because some infections are so virulent and difficult to manage that you can lose young, healthy people with the strongest antibiotics.

As for Mr. Cole's second written complaint on June 27th regarding the head cold, Dr. Holden testified that they did not put patients on antibiotics for a head cold, as that is "poor medicine." In response to questions about lab work, Dr. Holden stated that he does not order lab work for routine colds or toothaches. Dr. Holden, did not see Mr. Cole but would have been the prescribing physician for the hydrocodone obtained over the phone by medic Conde on June 26, 1999, and for the antibiotic and pain medication prescribed on June 29th. Dr. Holden testified that he was very satisfied with the medic, Vince Conde, and the paramedic, Mamie Trahan,

8

that they treated the inmates the same as private patients, and that they transcribed medical complaints almost to the letter. He added that in his experience, the medics would rather err on the side of safety.

Dr. Kurt Rothermel, one of the dentists regularly used by the Detention Center, and the dentist who was scheduled to treat Mr. Cole on July 2nd, testified that he starts dental patients on antibiotics immediately *if* they have an infection, but he would need to do x-rays, see the source of the pain, and see swelling, before prescribing antibiotics. Further, if he did not know the patient's history, he would not give antibiotics unless the patient gave proof of no allergies, presumably a statement that the patient was not allergic to penicillin or other antibiotics. If an extraction is needed, which is what Brian Cole suggested, and the only dental procedure the Sheriff's Department can pay for, Dr. Rothermel stated that he might not use antibiotics because the tooth is like a splinter; when it comes out, the infection goes away. He further testified that, if he used antibiotics, the treatment of choice is to pull the tooth, then put the patient on antibiotics. In the end, he stated that you cannot treat something that you do not know about or cannot see. Dr. Rothermel further added that he had seen patients come in and look fine one day, and the next day come back with an eye swollen shut. He stated that he had seen it happen in his own practice many times and that it is not neglect.

Likewise, Dr. George Desormeaux, an ER physician specializing in internal medicine, reviewed the records on behalf of Mr. Cole and actually corroborated the testimony of Drs. Holden and Rothermel. He testified that *if* an infection is found, the dentist should put the patient on antibiotics. He further stated that, "[i]f somebody has dental pain after a couple of days, a reasonable patient would try to seek a cause for the pain and get pain relief."

9

Mr. Cole's expert, Dr. David Martin, Chief of Infectious Diseases Section at LSU Medical Center in New Orleans, testified that he had seen only ten to fifteen cases of Group F Streptococcus in his career of almost thirty years, and in his treatment of 5,000 to 10,000 patients. He further stated that the progression of the infection to the extent that it did in Mr. Cole was incredible and that he had never seen anything like it. Dr. Martin further stated that antibiotics do not penetrate into an abscess, which has to be drained before the antibiotics can work. He testified that he could not create a time line regarding the stages at which the infection grew because it was an asymptomatic colonizer, and the time of initiation could not be identified as in chicken pox wherein you can determine the time of initial exposure. Nor could one track the organism's progression in the body, as with fetal/embryo development, to determine when the organism was susceptible to treatment by antibiotics because there was no published data, and there was no textbook chart on Group F. In hindsight, Dr. Martin testified that the first symptomatic manifestations of the infection spreading beyond the sinuses was the verbal complaint to the guard of a light cold on June 26th. He stated that one could make the argument that it was too late to start antibiotics on the 26th.

Dr. Martin went on to testify in his deposition that he thought starting antibiotics between the 15th and the 28th when swelling showed up would have prevented progression of the infection beyond the sinuses. He stated that one can say that antibiotics on the 20th perhaps would give him a better than 50% chance of containing the organism or avoiding the complications. Then he said, probably, antibiotics some time between the 15th and the 25th, more likely than not, would have prevented his complications on the 26th. Dr. Martin then followed with, "He would have had a better chance if he had been started on antibiotics on the 26th but I'm less

comfortable with that as being a time that antibiotics and decongestants or whatever, would have worked." Dr. Martin changed his testimony at trial, and his percentages were ultimately rejected by the trial court.

Dr. Martin stated that the infection started because a sinus passage stopped up, and that the presence of the Group F caused the maxillary sinusitis as well as the orbital cellulitis. He further stated that it would be difficult to determine about which day the antibiotics would have prevented the complications of the infection. Dr. Martin stated that you could say the earlier the more likely, but the antibiotic would have had to be administered along with drainage of the sinuses in order to cure the infection. Dr. Martin further testified that the dentist at Charity Hospital took complete Panarex X-rays; the x-rays revealed no dental problems; and that condition would have been the same a day or a week or a month before.

Without the benefit of hindsight and with regard to what the medics saw and did for Mr. Cole, Dr. Martin testified that when Paramedic Trahan examined Mr. Cole on June 16th, in response to his first medical request form on the 15th, Mr. Cole had no swelling to the gum area, there was no visual evidence of abscess, and no mention of complaints of fever. Dr. Martin stated simply that he had a toothache; referral to a dentist was the appropriate thing to do; it was not a dental emergency; it was not a medical emergency. He testified that there was no evidence that Mr. Cole had requested additional medical attention between the 15th and the 25th, or that he had presented with any different symptoms like fever or swelling or any signs of infection during that time period. With regard to the 26th and the verbal complaint to the guard of a light cold, which in hindsight was the first symptomatic manifestations of the infection spreading, Dr. Martin testified that reports of

11

toothache and pain and a light cold do not require an immediate trip to the dentist or to an emergency room.

Moreover, Dr. Martin stated that the prison staff contacted a doctor on the 26th and obtained hydrocodone for Mr. Cole, and that pain medication given for toothache and pain and a light cold was reasonable medical care from the prison staff. Dr. Martin further testified that medic Conde's response to the written medical request form of June 27th, which had complaints of head cold or flu but not fever, and where there was no swelling and no other sign of problems, was a reasonable response wherein medic Conde administered Equate Cold Relief Plus.

Dr. Cary Hernandez was the defendant's medical expert. Dr. Hernandez made it clear that he did *not* say that antibiotics would have made a difference if given on the first or second day. He stated that there was no way to know when the strep became present and no way to know if antibiotics earlier would have made a difference. He agreed with Dr. Martin that antibiotics alone will not get to an abscess, and that the abscess had to be drained for the antibiotics to work. Dr. Hernandez named several antibiotics that *may* have helped *if* they had known that Mr. Cole really had maxillary sinusitis when he complained of toothache. He pointed out that Mr. Cole did not complain of a fever until June 28th and that the ER record of American Legion Hospital indicated no fever on the morning of June 29th. Dr. Hernandez agreed that the infection was progressing and migrating when Mr. Cole started to feel cold and flu symptoms, which was on June 26th.

Dr. Hernandez testified that antibiotics early on *possibly* would have helped, unless Mr. Cole had had an allergic reaction to the antibiotic, but he thought everything was done correctly. While Dr. Hernandez said that he would have put Mr. Cole on antibiotics immediately *if* there were fever, swelling, or redness, he stated

12

that he probably would not have put Mr. Cole on antibiotics if Ms. Trahan had called him on the 16th. Rather, Dr. Hernandez stated that he would have used pain medication and follow-up by telling the patient to call if it got worse. He further stated that Mr. Cole was treated appropriately with analgesics at the Detention Center and that he did better until the 27th.

Some of Dr. Hernandez' deposition testimony, as well as the testimony of other witnesses, appeared to be self-contradictory during the same examination, likely due to the excessive repetition and sometimes confusing date references in the questions. We also note that Mr. Cole's attorney often referred to Mr. Cole's "demise" during questioning, and he was admonished more than once for asking compound questions. After Dr. Hernandez testified that he would not have put Mr. Cole on antibiotics if Ms. Trahan had called him on the 16th and that everything was done correctly by the Detention Center, he later testified that, after doing a history and exam for pain from a tooth or sinusitis, he *would* put a patient on antibiotics pending his seeing a dentist, even without redness and swelling. However, he clearly said that he would want to see how sick the patient was before allowing antibiotics. When not presented with a hypothetical regarding what he *would* do, as a medical doctor confronted with complaints of toothache, Dr. Hernandez overwhelmingly testified that Mr. Cole received good care, and that he survived because Ms. Trahan saw how ill he was and sent him to the emergency room, and because they administered him antibiotics and then got him to the emergency room again when his condition worsened.

**Timing of Dentist Appointment**

Dr. Rothermel had a record of the appointment for Mr. Cole scheduled on July 2, 1999, but he did not have any way of knowing when the request for an

appointment came in. Mr. Cole attempted to show that the appointment could have been made as late as the 29th when medic Conde noted the appointment in his own notes as, "appointment, Dr. Rothermel, 7/02/99." Medic Conde could not remember anything about making the appointment, but stated that he usually made dental appointments as soon as he finished up with his examination of the inmate. Notwithstanding, he agreed that either he or Ms. Trahan had made the appointment on the date of his note, the 29th, because the only other reference to the date of July 2, 1999, was the transportation slip showing the dental appointment on that date. Paramedic Trahan testified that her practice was to make the appointment within a day of making her note to schedule the dentist appointment, which was June 16th in this case. Her interpretation of Mr. Conde's note on the 29th was that he had found the transportation slip and was noting an appointment already made, i.e., "appointment, Dr. Rothermel, 7/02/99."

Dr. Desormeaux, the emergency room physician who reviewed the records for the plaintiff, testified that waiting two weeks for a dental appointment is a little excessive and that something should have been addressed in three to five days *if there was evidence of a dental abscess* or something like that. In this case, there was no dental abscess, and there was no evidence of dental abscess.

In response to questions regarding the proper amount of time between the complaint of a toothache and the dental appointment, Dr. Hernandez testified that he would put the patient on something for pain and get him to the dentist in three to ten days. Earlier in his deposition, he said if the patient were going out of town, he would treat him for pain and get him to a dentist within two to three weeks. The trial court found that the seventeen day delay for the dentist appointment in this case was reasonable where there was no sign of infection and no dental emergency. We agree.

14

**Basic Jail Guidelines**

The Louisiana Sheriff's Association (LSA) and the Department of Public Safety and Corrections entered into an agreement to promulgate basic jail guidelines (Guidelines) with compliance inspections every three years. Mr. Cole asserts that the Acadia Parish Sheriff's Department did not comply with some of these Guidelines. As a threshold matter, we note that the record contains memoranda from the Department of Public Safety and Corrections indicating that the Sheriff of Acadia Parish was in compliance with the "Basic Jail Guidelines" when inspected on March 17, 1998 and on March 21, 2001. The memoranda provide congratulatory remarks to the Sheriff and state that the monitoring report and re-certification apply to all three of his facilities, the Acadia Parish Detention Center, where Brian Cole was incarcerated, the Acadia Jail Annex, and the Acadia Jail Complex.

The medical team at the Sheriff's Department in 1999 consisted of an internal medicine physician, Dr. Ben Holden, paramedic Mamie Trahan, medic Vincent Conde, and a back-up medic, Melvin Clay. Dr. Holden was on call twenty-four hours a day, seven days a week (24/7) and visited the facility one day a week if there were new, incoming inmates to examine, or if anyone was sick. If there were no new prisoners and no one was sick, Dr. Holden did not go to the facility on the allotted day. However, he provided telephone assistance to the medics whenever needed.

Mamie Trahan was a certified paramedic, also called an EMT paramedic. She obtained her certification in-house with an ambulance service. The course was a two-year college program, accelerated for in-house candidates into eighteen months. She had been an ambulance paramedic and a paramedic for one of the casinos. Vince Conde was an EMT (emergency medical technician) who had obtained his training

at trade school at night and on weekends. His EMT educational status is less than the paramedic status of Ms. Trahan. However, Mr. Conde was also an assistant warden with the Sheriff's Department. Ms. Trahan and Mr. Conde were both typically referred to as "medics." The medics worked 8:00 a.m. to 4:00 p.m., Monday through Friday, primarily at different facilities, but flexed and assisted, when both were needed at one place. They rotated call 24/7 every other week, which, as indicated, included weekends. Therefore, in addition to Dr. Holden, one medic was on call at all times.

Mr. Cole argues that the "medics did not have standing orders to consult concerning what to do when there was a complaint of tooth pain in the upper molar, nor were the medics informed by standing order to consider whether there might be a sinus infection causing tooth pain." He further argues that the Basic Jail Guidelines make it clear that *standing or direct orders* of the physician must be in writing, pursuant to Section IV-015. Mr. Cole somewhat misrepresents the content of the Guidelines. The Guidelines do not mandate *standing* orders, and clearly do not mandate written *direct* orders or even address *direct* orders. More specifically, the Basic Jail Guidelines, Part IV, Institutional Services, Subpart IV-015, provides as follows:

> IV-015 - Written policy, procedure, and practice provide that anyone who provides health care services to inmates be licensed, registered or certified as appropriate to their respective professional disciplines. Such personnel may only practice as authorized by their license, registration or certification. Standing orders are used in the treatment of inmates only when authorized in writing by a physician or dentist. (Standing orders are used in the treatment of identified conditions and for the on-sight emergency treatment of an inmate.)

Accordingly, written standing orders are not mandated at all, particularly for every conceivable ailment that an inmate might have, whether it be a hangnail or

a heart attack. Rather, standing orders are *limited* to whatever the physician deems appropriate. It is unreasonable to suggest that procedures for every kind of toothache and head cold, or even serious event, must be written down. Subpart IV-015 explains in the parenthetical those situations for which standing orders are appropriate, but it does not mandate that the physician must promulgate them for any particular condition. If that were true, in order to provide standing orders as comprehensive as Mr. Cole suggests, the physician would have to basically put his entire practice in writing. Moreover, Title 22, Chapter 29, Section 2909 and the expert testimony below make it clear that no restrictions are placed on the medical judgment of the physician.

In this case, Dr. Holden, the facility physician, testified at trial that he only had standing orders for detoxifying those inmates on opiates or benzodiazepines. They were written orders explaining what substance to give, how to administer it, and how many days to continue it. The absence of a written standing order for maxillary sinusitis or toothache, or more specifically, maxillary sinusitis masking as a toothache, does not violate the statutes and guidelines put at issue in this case.

Mr. Cole further argues that the medics, who were not even licensed nurses, should not have been making diagnostic decisions. Instead, they should only follow standing orders and dispense medication, pursuant to the Basic Jail Guidelines, Part IV, Institutional Services, Subpart IV-016, which provides as follows:

> IV-016 - Correctional or other personnel who do not have health care licenses may only provide limited health care services as authorized by the responsible health care authority and in accordance with appropriate training. This would *typically* involve the administration of medication, the following of standing orders as authorized by the responsible health care authority and the administration of first aid/CPR in accordance with POST training. (Italics ours.)

17

In the present case, the paramedic and medics were very familiar with complaints of toothache since, as Dr. Holden stated, eighty percent (80%) of the inmates had dental problems. The medics were trained and authorized to take medical histories, examine inmates, and make dental appointments, which was done in this case. Both Dr. Holden and Dr. Rothermel, the dentist, stated that they trusted the medics to decide when and if to call them, and they believed the complaints of Mr. Cole were handled properly. The medics testified that they would call the doctors when they saw evidence of infection or complaint of severe pain, neither of which was present in Mr. Cole until the 28th. Obvious emergencies were handled by going directly to the emergency room, which was also done in this case, twice on the 29th. We see no violation of IV-016 which is a broad guideline stating that medical treatment by non-licensed health care providers is limited to their training. There is no evidence in this case that the medics overstepped their training.

Mr. Cole further argues that, pursuant to the Basic Jail Guidelines, the Sheriff's Department should have had medical call three times per week instead of one time per week because there were 150 to 175 inmates at the combined facilities. We disagree. The Guidelines provide as follows:

> IV-021 - Written policy, procedure, and practice require that sick call is conducted by a physician and/or other qualified health care personnel who are licensed, registered, or certified as appropriate to their respective professional discipline and who practice only as authorized by their licence, registration, or certification. Sick call shall be available to all inmates as follows:
>
> 1. Facilities with fewer than 100 inmates - 1 time per week;
>
> 2. Facilities with 100 to 300 inmates - 3 times per week;
>
> 3. Facilities with more than 300 inmates - 4 times per week.

> If an inmate's custody status precludes attendance at sick call, then arrangements must be made to provide such services in the place of the inmates detention.

The Detention Center where Brian Cole was incarcerated housed approximately 94 inmates. The last expert to testify at trial was Mr. George J. Armbruster, Jr., a certified peace officer working for the Youngsville Police Department and retired warden from the Lafayette Sheriff's Department. Mr. Armbruster has a bachelors degree in Criminal Justice, was training director at Acadiana Law Enforcement Training Academy, and has been accepted as an expert on standards for the incarceration of inmates under the Louisiana Department of Safety and Corrections in state courts in twenty-four parishes, as well as federal courts in Louisiana, Texas, and Arkansas.

Officer Armbruster studied the medical records, charts and activity logs of Brian Cole, reviewed the depositions, and listened to the trial testimony in this case. It was his expert opinion that the Detention Center was in complete compliance with the Basic Jail Guidelines promulgated by the Department of Corrections and the Louisiana Sheriff's Association. He testified that the number of inmates at the Detention Center required Dr. Holden to provide sick call once a week, and there is no requirement to provide call three times a week at one facility because of an aggregate number of inmates at all of the facilities. This is certainly logical where Dr. Holden also went to the other facilities for sick call. Moreover, the medics are certified personnel, as required in IV-021, they are at the facilities and pull the medical request forms from the folder holder on the wall and see inmates every day of the week.

Accordingly, Officer Armbruster further testified that inmates filled out medical request forms, and the medics picked them up, and that Mr. Cole's requests

19

were always addressed. He stated that the daily activity logs indicated that the medics came out when called in all hours of the day and night and on weekends. He emphasized the fact that the physician alone determines the responsibilities of the medical staff based upon his assessment of their abilities. He also stated that there were policies in place to transfer Mr. Cole to New Orleans when the community hospital was not equipped to handle his condition, and those policies were followed.

**Title 22, Minimum Jail Standards**

Mr. Cole argues that the Sheriff's Department did not follow the requirements of certain sections of the Louisiana Administrative Code, Title 22 (Corrections, Criminal Justice and Law Enforcement), Part III, Subpart 2, Minimum Jail Standards. Chapter 25, Introductory Information, provides as follows:

### § 2503. Introduction

A. The purpose of these standards is to provide a reasonable guideline for use by persons responsible for the planning, administration and construction of parish jails in Louisiana. They are intended to reflect the minimum requirements which comply with court orders and protect the guaranteed rights of inmates in custody. The criteria were derived from court decisions, Louisiana state statutes, codes and regulations, and standards developed by organizations in the criminal justice field. The items generally avoid specific numerical absolutes so as to be useful to jails of all sizes and populations.

AUTHORITY NOTE: Promulgated in accordance with R.S. 15:1204 and R.S. 15:1207.

HISTORICAL NOTE: Promulgated by the Office of the Governor, Commission on Law Enforcement and Administration of Criminal Justice, LR 6:598 (Oct. 1980).

In particular, Mr. Cole argues that the Detention Center violated subsections A through D of Section 2909 of Chapter 29, on Inmate Support. More specifically, he asserts that there were no written policies and procedures *manuals*

developed by Dr. Holden or by the dentists used by the Detention Center, and there were no written standing orders addressing Mr. Cole's specific medical problem. Section 2909, subparts A through D, provide as follows:

### § 2909.  Medical and Health Care

A.  A licensed physician shall be responsible for the health care program and for the practice of medicine in the institution, and no restrictions shall be placed on the medical judgment of the physician.

B.  All health care shall be provided in accordance with written policies and procedures developed by the physician in charge and endorsed by the administrator.

C.  Dental care shall be provided under the direction, supervision and written procedures of a licensed dentist.

D.  Treatment given by other than a licensed physician shall be made by trained personnel according to written, standing or direct orders of the physician in charge.

Officer Armbruster, the expert in DOC standards and guidelines, testified that Dr. Holden was the supervising physician, and that he had policies and procedures in place, and those procedures were followed.  They were evidenced by the Request for Medical Attention forms, the procedures for collecting them each morning and then seeing the inmates in the medic's room, the mandated physical examination by a physician for all new incoming prisoners, the procedure of recording the inmate's medical history and exam, the Daily Activity Logs recording every single activity that occurs on the floor, the Medication Logs requiring the inmate's signature and time of dispensation of every dose of medication that he receives, and the procedure for once a week call and 24/7 call.  Officer Armbruster further testified that these procedures applied to the dental needs of the inmates as well because the Detention Center used outside dentists.  Officer Armbruster was the only expert on DOC standards and guidelines to testify in this case.  His expert

testimony, along with the compliance certifications by the Department of Corrections, the documentary exhibits, and the testimony of witnesses in this case are sufficient to find no merit in Mr. Cole's argument on this issue.

**Motion for New Trial**

Mr. Cole filed a Motion for a New Trial asserting that the judgment was contrary to the law and the evidence, pursuant to La.Code Civ.P. art. 1972. The trial court is accorded vast discretion in deciding whether to grant a motion for a new trial, and its decision whether to do so is reviewed pursuant to the abuse of discretion standard of review. The standard of review for the grant or denial of a new trial on peremptory grounds, pursuant to La.Code Civ.P. art. 1972, or on discretionary grounds, pursuant to La.Code Civ.P. art. 1973, is abuse of discretion. *Davis v. Coregis Ins. Co.*, 00-475 (La.App. 3 Cir. 12/27/00), 789 So.2d 7, *writ denied*, 01-292 (La. 3/30/01), 788 So.2d 1192.

At the hearing on Mr. Cole's Motion for a New Trial, he reiterated previous arguments regarding isolated segments of deposition testimony which appeared to support his position and omitted sections of the same deposition that more strongly and pointedly opposed his position. More specifically, he argued that the defendants' expert on prisons said medical care should be run under the supervision of *doctors*, the implication of counsel being that this did not mean that medics like Mamie Trahan and Vince Conde should be performing in the manner in which they did. Counsel was referring to the testimony of Officer Armbruster. However, as indicated above, Officer Armbruster testified repeatedly, demonstrating with specific examples, that the Detention Center *was* run under the supervision of Dr. Holden, who had policies and procedures in place, that Dr. Holden had complete

22

discretion and control with regard to the medical procedures, and that those procedures were followed in Mr. Cole's case.

Additionally, plaintiff urged again that Dr. Holden's standing orders for putting the inmate on antibiotics for a complaint of toothache were not followed. This has been one of several repeated and patent misrepresentations of the testimony in the record, which has clearly established that no such standing order was in place. The only standing order that Dr. Holden had implemented was the set of directions for ministering to prisoners who were on opiates or benzodiazepines. Mr. Cole further argued that medic Trahan should have taken him to the emergency room much earlier, and the court responded accurately that no doctor had testified that a toothache justified taking an inmate to the emergency room.

The court stated that what was relevant was whether the care was appropriate in light of the complaints made. At the hearing on the Motion for a New Trial, it stated that the medical care was appropriate, until June 26th and 27th, when the medics increased Mr. Cole's medication to hydrocodone, and that they should have gotten a doctor at that point, but it was already too late. However, we note that the record indicates that medic Conde did call Dr. Holden at that point because, while he can prescribe over-the-counter ibuprofen for the inmates, Mr. Conde testified that he had to call Dr. Holden for hydrocodone, and he would have explained the chart and history to Dr. Holden at that point. He further indicated that Dr. Holden would have prescribed antibiotics on the 26th if they had been indicated, which they were not, as there was still no fever or swelling. We find that medic Conde acted reasonably on the 26th when he responded to Mr. Cole's verbal complaint to a guard that he had "toothache and pain." This is essentially the same complaint that he had on the 15th when he filled out the first Request for Medical Attention form; on the 26th, he did not

23

even put it in writing. In any event, medic Conde apparently believed that the pain had increased enough on the 26th to call the doctor, and that is what Dr. Holden expected him to do.

The trial court's earlier ruling was that reasonable care would require *recorded* examinations of Mr. Cole's gums when he received the ibuprofen around the 19th, but since there was never anything wrong with his tooth, such an examination would not have revealed any changes or helped in any way, and the absence of the examination was not the cause of the spreading of the infection. Similarly, in its earlier ruling, the trial court indicated that reasonable care required a recorded examination on the 26th when medic Conde responded to another verbal complaint of Mr. Cole and obtained the hydrocodone from Dr. Holden. The trial court stated, however, that by this time it was too late in light of the expert testimony stating that the cold symptoms on the 26th meant that the infection was already running away, and that was only stated in hindsight because Mr. Cole still had no visible signs of infection, or swelling or fever on the 26th or even the 27th when he filled out the second medical request form.

Unlike the trial court, we do not find that it was unreasonable to approve over-the-counter ibuprofen around the 19th or 20th without an examination in response to a verbal request where there is no written Request for Medical Attention form and no signs of visible problems. The medical procedures in place provided for the medic's examination notes to be placed on the bottom of the inmate's Request for Medical Attention form. Mr. Cole did not fill out such a form between the 15th and the 27th. Therefore, it does not seem unreasonable to approve ibuprofen pursuant to a verbal request without a recorded examination in this instance. Nor do we find that Mr. Conde's actions were unreasonable on the 26th, as explained above.

24

Similar to the trial court's statement, the relevant issue is whether the medical treatment was reasonable in light of the complaints made and the symptoms exhibited. The experts testified overwhelmingly that the medical staff at the Detention Center acted appropriately.

Finally, while not assigning it as a specific error, counsel for Mr. Cole argues that the trial court applied a higher standard of proof than preponderance of the evidence in not accepting Dr. Martin's percentages with regard to the point in time that Mr. Cole had a chance of avoiding complications. Based upon the cross examination of Dr. Martin at trial, the trial court was correct in finding that Dr. Martin's percentages were unreliable. At trial he recanted and qualified his earlier deposition testimony to the point that it was muddled and, when he was pressed by defense counsel in cross examination, he changed his percentages to the point that, as the trial court stated, they were whimsical.

However, we do not have to reach that issue, because regardless of whether Mr. Cole could have benefitted from antibiotics on the 26th or the 27th, antibiotics were not indicated on those dates, and we have found that the medical services at the Detention Center were appropriate in light of the complaints made and the symptoms exhibited. As previously indicated, Dr. Martin was one of the experts who so testified. Dr. Martin further admitted that it was too late to prevent the complications on the 28th, which is when Mr. Cole complained of fever, sore throat and sinus congestion, evidencing signs of infection.

IV.

**CONCLUSION**

Accordingly, while our reasoning is different from that of the trial court, in that we find that the medical staff at the Detention Center provided reasonable care

25

without breach, rather than finding breach without causation, we find no manifest error in the dismissal of the defendants and the denial of a new trial. Based upon the foregoing, we affirm the judgment of the trial court dismissing the claims against the Acadia Parish Sheriff, the Acadia Parish Sheriff's Department, and Evanston Insurance Company.

All costs of appeal are assessed to the plaintiff, Brian Cole.

**AFFIRMED**.